MAYER BROWN LLP
DALE J. GIALI (SBN 150382)
*dgiali@mayerbrown.com*
MICHAEL L. RESCH (SBN 202909)
*mresch@mayerbrown.com*
STEVEN E. RICH (SBN 198412)
*srich@mayerbrown.com*
BARRETT L. SCHREINER (SBN 266617)
*bschreiner@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone: (213) 229-9500
Facsimile:  (213) 625-0248

Attorneys for Defendant
CHOBANI, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| KATIE KANE, *et al.,* individuals, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>       v.<br><br>CHOBANI, INC.,<br><br>                    Defendant. | Case No. CV 12-02425-LHK<br><br>**DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Second Amended Complaint filed: October 10, 2012<br><br>Date:    July 11, 2013<br>Time:   1:30 p.m.<br>Judge:  Hon. Lucy H. Koh |

DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. CV12-02425-LHK

705737153.1

## I. BACKGROUND AND QUALIFICATIONS

1. My name is Dr. Scott Gottlieb. I have been retained by Chobani, Inc. to provide expert testimony concerning the Food and Drug Administration's ("FDA" or "the agency") regulations, policies and statements with respect to, among other things, food labeling, warning letters, and the process for developing agency guidance documents. I have personal knowledge of the matters set forth in this declaration and if called to testify at a hearing or trial in this matter would so state.

2. From 2005-2007, I served as FDA Deputy Commissioner for Medical and Scientific Affairs by appointment of President George W. Bush. In this capacity, I coordinated medical and scientific policy and regulatory affairs for the Commissioner's office, served as a senior policy advisor to the Commissioner, and handled FDA liaison with the U.S. Department of Health and Human Services and the White House. I also assumed the role of Acting Commissioner during the FDA Commissioner's extended absence and travel. Among my responsibilities, I cleared all significant final guidance documents, in particular level 1 guidance, from the Center for Food Safety and Nutrition (CFSAN) before the FDA could issue them. Among other matters, I worked on the FDA's policy on qualified health claims, which expanded a framework by which manufacturers could make qualified health claims on food products. I was also involved in hearing appeals from industry related to food labeling concerns, and issues around the updating the food label for disclosure of trans fats, among other matters. I also helped lead discussions around developing a potential framework for restaurant labeling.

3. From 2003-2004, I served as a Senior Advisor to the FDA Commissioner and then as FDA's Director of Medical Policy Development. As the Director of Medical Policy Development, I was responsible for coordinating policy initiatives between the Office of the Commissioner and each of the agency's centers. As Senior Advisor to the FDA Commissioner, I advised the Commissioner with respect to emerging technologies and regulatory policy development in FDA's three medical centers, drafted the Commissioner's speeches and served as a member of the White House Biodefense Interagency Working Group.

4. I have testified as a witness on health and regulatory matters before the United States Senate and the House of Representatives.

1

705737153.1

DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. CV12-02425-LHK

5. Among other honors and awards for my work, I received the FDA Special Recognition Award (2007) and the CMS Administrator's Citation in recognition of leadership, performance, and dedication to the public service and programs of the U.S. Department of Health and Human Services (2004).

6. I received an undergraduate degree in economics from Wesleyan University (Middletown, Connecticut) in 1994, and a medical degree from the Mount Sinai School of Medicine in 1999. I completed a residency in internal medicine at the Mount Sinai Hospital in New York in 2002, served as an attending physician at Stamford Hospital from 2003-2010 and an attending physician at NYU's Tisch Hospital in Manhattan in 2011. I am currently a Clinical Assistant Professor at the New York University School of Medicine.

7. Additionally, I also serve as an editorial board member to The Food and Drug Law Institute's Policy Forum. I am also a member of the policy board to the Society of Hospitalist Medicine and the Leukemia and Lymphoma Society.

8. I have attached my most recent CV, and a list of my publications authored during the last ten years has been included as Exhibit A.

9. I am being compensated by Chobani, Inc. based on the number of hours worked on this matter at a billing rate of $600 per hour. My compensation is not contingent in any way on my opinion or the substance of any testimony in this matter or the outcome of this litigation.

## II. INFORMATION CONSIDERED

10. The opinions offered in this report are based on my training, expertise, and background, as well as my review of documents and other materials cited in this report, including plaintiffs' motion for preliminary injunctions and the declarations of Dr. F. Edward Scarbrough and Dr. Robert H. Lustig.

## III. SUMMARY OF OPINIONS

11. Based upon my experience and the materials that I have reviewed, I have reached the following conclusions.

12. First, final FDA guidance documents set forth the agency's interpretation of or policy on a regulatory issue. Parties affected by the issues raised in an FDA guidance document are not required to follow the recommendations or policies laid out in the document. "Guidance documents do not establish

2

DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. CV12-02425-LHK

705737153.1

legally enforceable rights or responsibilities. They do not legally bind the public or FDA" and parties may "choose to use an approach other than the one set forth in a guidance document."[1]

13. Second, "Draft" guidance documents are of even less significance and cannot be taken as a statement of the agency's current policy view. Draft guidance is issued with the purpose of soliciting public comment on the agency's proposed policy view. Typically, the FDA will open a public docket with the express purpose of soliciting public comment on a draft guidance document. It will then amend the guidance document – as it deems appropriate - based on this public input, and then re-issue the guidance as "final" agency guidance. Here, the document "Guidance for Industry: Ingredients Declared as Evaporated Cane Juice; Draft Guidance" was issued by FDA in draft form in October 2009. But FDA never finalized it. As a result, one should not assume that the document represents the agency's current point of view. FDA's own guidelines place on the agency an obligation to revise and re-issue draft guidance documents in final form, or otherwise withdraw draft guidance documents. Moreover, the agency states on the cover of the document itself that a "draft guidance" represents the FDA's "current thinking" only "when finalized." Draft guidance documents typically reflect only the opinion of the review staff or staff person of a given agency center or office charged with writing the guidance, and will not have undergone any formal review through the full agency management chain inside the agency prior to being released in a draft form.

14. Third, when FDA makes a decision to compel manufacturers to conform their food labeling practices in a specific manner, the agency generally issues a force and effect of law regulation, institutes litigation, or both.

15. Fourth, the plaintiffs' expert Dr. Robert H. Lustig contends that the use of the term "Evaporated Cane Juice" has been determined to be "false and misleading according to the FDA". The FDA has made no such determination. The plaintiffs' expert Dr. F. Edward Scarbrough asserts that the use of the term "Evaporated Cane Juice" formed the basis of warning letters issued by FDA. This allegation did not form the basis for the warning letters that were issued. These letters largely turned on

---

[1] 21 CFR 10.115, Part 10, Administrative Practices and Procedures, Subpart B General Administrative Procedures, Sec. 10.115 Good guidance practices.
http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=10.115.

3

other, unrelated infractions that the sponsors in question were alleged to have committed. Finally, even accepting the facts as represented by the plaintiffs' experts (which should not be done), based on my experience and as a matter of policy, the FDA would never order a recall of a product under the circumstances at hand.

## IV. Opinion #1: FDA Guidance Is Non-Binding. Regulated Entities Are Not Obligated To Follow Recommendations Made In A FDA Guidance Document.

16. FDA guidance documents set forth the agency's interpretation of or policy on a regulatory issue but do not establish legally enforceable rights or responsibilities. They do not legally bind the public or FDA and the agency states that parties may "choose to use an approach other than the one set forth in a guidance document."[2] FDA specifically states that "Are you or FDA required to follow a guidance document? (1) No. Guidance documents do not establish legally enforceable rights or responsibilities. They do not legally bind the public or FDA. (2) You may choose to use an approach other than the one set forth in a guidance document. However, your alternative approach must comply with the relevant statutes and regulations. FDA is willing to discuss an alternative approach with you to ensure that it complies with the relevant statutes and regulations."

17. The plaintiffs' expert Dr. F. Edward Scarbrough incorrectly cites the October 2009 Draft Guidance Document as an "issued" guidance document and interprets the document as a statement of the agency's regulatory policy. As is clear from the above, this is a misinterpretation of the regulatory impact of this draft guidance. To draw these conclusions is to incorrectly overstate the agency's own stated intent of draft guidance documents.

18. Regulated companies (sponsors) should not derive from agency actions, including statements made in speeches and to the media, Q&A documents, written communication, and warning letters, what the agency's broad policy position is. A warning letter only details the agency's view with respect to the sponsor that is the subject of the letter. FDA states that "The agency may not use documents or other means of communication that are excluded from the definition of guidance document to informally communicate new or different regulatory expectations to a broad public audience for the

---

[2] See fn. 1.

4

first time." These guidelines are contained in the agency's Good Review Management Practices and "must be followed whenever regulatory expectations that are not readily apparent from the statute or regulations are first communicated to a broad public audience."[3] An FDA guidance document does not represent an official FDA position, but rather represents the current opinion of the individual(s) in an agency office or center who authored the document. FDA generally has a low administrative threshold for issuing draft guidance. As such, it has no legal effect.

## V. Opinion #2: The FDA Guidance Document Concerning Evaporated Cane Juice Was Issued in Draft Form, and Never Finalized. As Such, The Draft Guidance May Not Be Relied Upon In The Manner Suggested By Plaintiffs And Their Experts.

19. FDA has a well-established process for issuing new, non-binding guidance to sponsors. In this case, concerning Evaporated Cane Juice, that process was never completed, and FDA never formally established the guidance in question.

20. Among the steps in that process: After FDA prepares a draft of a guidance document, FDA will: (A) Publish a notice in the Federal Register announcing that the draft guidance document is available; (B) Post the draft guidance document on the Internet and make it available in hard copy; and (C) Invite your comment on the draft guidance document. After FDA prepares a draft of a guidance document, FDA will often: (A) Hold public meetings or workshops; or (B) Present the draft guidance document to an advisory committee for review. Only after providing an opportunity for public comment on a guidance document, FDA will: (A) Review any comments received and prepare the final version of the guidance document that incorporates suggested changes, when appropriate; (B) Publish a notice in the Federal Register announcing that the guidance document is available; (C) Post the guidance document on the Internet and make it available in hard copy. Only then will the agency implement the guidance document.

21. Here, with respect to the guidance pertaining to "Evaporated Cane Juice," FDA had only completed the first step in this process for establishing new agency guidance. Moreover, FDA generally

---

[3] See fn. 1.

5

705737153.1    DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. CV12-02425-LHK

has a low threshold for issuing draft guidance. As such, a draft guidance has no binding legal effect whatsoever.

## VI. Opinion #3: When FDA Has A Public Health Concern With Respect To The Way That A Food Ingredient Is Listed On Product Labeling, It Generally Relies On Issuing Regulations To Compel Changes In Labels.

22. When FDA wants to require manufacturers to change the way an ingredient is listed on food product labeling, it generally relies on regulations to establish these new principles. For example, FDA recently began requiring food manufacturers to list trans fat (i.e., trans fatty acids) on Nutrition Facts and some Supplement Facts panels. This was accomplished by a regulation that was issued several years ago by the agency.[4] On occasion, FDA will resort to litigation to compel a labeling practice – but litigation only affects the parties at bar, whereas a regulation has a much broader sweep to its compass, and as a result is viewed as a much more efficient regulatory tool.

## VII. Opinion #4: The Plaintiffs' Expert Dr. Robert H. Lustig, Contends That The Use Of The Term "Evaporated Cane Juice" Has Been Determined To Be "False And Misleading According To The FDA". The FDA Has Made No Such Determination. Plaintiffs' Expert Dr. F. Edward Scarborough Asserts That Warning Letters Were Issued On The Basis Of Chobani's Use Of That Term. The Warning Letters In Question Appear Instead To Have Been Issued On The Basis Of Other Alleged Violations Of The Act.

23. Contrary to plaintiffs' expert, the use of the term "Evaporated Cane Juice" has not been judged to be false or misleading by FDA. Such a determination by FDA cannot be established in draft guidance documents, or warning letters sent to individual manufacturers, as Dr. Lustig contends. Indeed, the warning letters Dr. Lustig cites as evidence of FDA's policy with respect to use of the term ECJ contain a raft of other violations that the individual firms were being cited for. None of these letters rested solely on the FDA's concerns around the use of the term ECJ in labeling, and a reasonable reading of these letters strongly suggests that FDA's statements around the use of ECJ was a peripheral factor in the issuance of these letters.

---

[4] 21 CFR 101.9 (c)(2)(ii). Food and Drug Administration (2003-07-11).

6

DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S
705737153.1    OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. CV12-02425-LHK

24. Dr. Scarbrough similarly states that the warning letters were "concerning the use of the term 'evaporated cane juice." On the contrary, these warning letters turned on other violations that the sponsors had committed, including situations where sponsors were alleged to have made, among other things, new drug claims on food labeling and unauthorized nutrient content claims. The FDA's reference to ECJ in these warning letters appears, at best, to have been a secondary issue and is characteristic of FDA warning letters at the time, where the agency typically sought to fold in as many issues as possible, even if tertiary issues did not directly stem from the infraction that prompted the warning letter to be sent in the first instance. While Dr. Scarbrough served as FDA's Director of the Office of Food Labeling and would have been engaged in the generation of warning letters, a letter's final clearance was typically a matter for legal counsel.

25. None of the warning letters cited by Dr. Scarbrough was directed to Chobani, and even if they were, the warning letters – which are informal and advisory – would be (at most) allegations (not findings) and FDA would not, by issuing the warning letter, be committing itself in any way to take any enforcement actions. In any event, based on my experience as FDA Deputy Commissioner, the type of alleged infraction that Dr. Lustig portrays Chobani as having committed would under no reasonable circumstance trigger FDA to seek an injunction or seizure against a company. Indeed, there is no appropriate precedent for the agency taking such an action based on the technical infraction alleged here: listing ECJ in the ingredient list, especially when the precise, collective amount of all sugars is more prominently displayed on the Nutrition Facts Panel in compliance with 21 C.F.R. § 101.9(c)(6)(ii) (FDA regulation requiring a single number on the Nutrition Facts Panel representing the sum of all sugars). Issuing a recall of a product under these circumstances would deviate sharply from established FDA practices for addressing similar matters.

26. Moreover, neither Dr. Lustig, nor FDA, cites evidence establishing that consumers were misled by the phrase "Evaporated Can Juice" or that its use in product labeling caused consumers to incorrectly conclude that the yogurt product did not contain sugar. If FDA were to accept this position as fact, and change its regulatory practices as a consequence, this assertion would need to be supported by data to support the alleged consumer deception, at a minimum.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of April, 2013 at New York, NY.

*[signature]*
Dr. Scott Gottlieb

8

705737153.1

DECLARATION OF SCOTT GOTTLIEB IN SUPPORT OF DEFENDANT CHOBANI, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; CASE NO. CV12-02425-LHK